Barry J. Glickman, Esq.
bglickman@zeklaw.com
Bruce S. Goodman, Esq.
bgoodman@zeklaw.com
ZEICHNER ELLMAN & KRAUSE LLP
1211 Avenue of the Americas
New York, New York 10036
(212) 223-0400 (telephone)
(212) 753-0396 (facsimile)

Attorneys for Plaintiff
   JPMorgan Chase Bank, N.A.

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JPMORGAN CHASE BANK, N.A.,<br><br>                                    Plaintiff,<br><br>- against -<br><br>MARK L. FREYBERG, individually and conducting business under the name of THE FREYBERG LAW GROUP,<br><br>                                    Defendant. | Case No.: 14-CV-6851 (RMB) (SN)<br><br>**STATEMENT PURSUANT TO RULE 56.1 OF THE CIVIL RULES OF THE SOUTHERN DISTRICT OF NEW YORK** |

       Plaintiff JPMorgan Chase Bank, N.A. ("Chase"), by its attorneys Zeichner Ellman & Krause LLP, contends that there is no genuine issue to be tried as to the following material facts.

       1.    Defendant is an attorney who has been in private practice for approximately 29 years under the name "Mark L. Freyberg d/b/a the Freyberg Law Group." [Glickman Decl. **Ex. 4** (Freyberg Dep. 14:11-15:21][1]

---

[1] "Glickman Decl." refers to the Declaration of Barry J. Glickman, dated May 27, 2015, submitted in support of Chase's motion for summary judgment.

2. Chase maintained a business checking account ending in 9790[2] in the name of Mark L. Freyberg d/b/a The Freyberg Law Group (the "Account") that defendant used as his law firm's operating account. [Id. (Freyberg Dep. 132:16-17)].

3. On Wednesday, February 26, 2014, defendant received an unsolicited e-mail from someone identifying herself as Ana Styrud, purportedly the Chief Financial Officer of a Swedish company named Diamyd Medical AB ("Fraudster Styrud"). [Id., **Ex. 4** (Freyberg Dep. 28:21-29:4); **Ex. 5**]

4. Defendant did not know Fraudster Styrud and had never represented "Diamyd." [Id., **Ex. 4** (Freyberg Dep. 28:21-29:4)]

5. A web search shows what appears to be a legitimate company called Diamyd Medical AB located in Stockholm, Sweden, with a website address www.diamyd.com, and e-mail addresses ending in "@diamyd.com."

6. Fraudster Styrud sent the e-mail using an e-mail address ending in "@outlook.com" address, not a "@diamyd.com" address. [Id., **Ex. 5** (D001)]

7. The e-mail read:

> We were referred to your firm by A member of American Bar Association [sic]. We are inquiring for an Attorney who specializes in Breach of Contract or Litigation.

[Id.]

---

[2] All but the last four numbers of the Account have been redacted to preserve customer confidentiality.

8. Defendant responded to Fraudster Styrud by e-mail approximately one hour later:

> Feel free to call to discuss at any time, or indicate if you would like to make a nt [sic]. Yes we specialize in litigation.

[Id., (D002)]

9. On Friday, February 28, 2014, defendant received a second e-mail from Fraudster Styrud. [Id., (D003)]

10. Fraudster Styrud sent this e-mail using an e-mail address ending in "@diiamyd.com," adding an additional "i" to Diamyd's name. [Id.]

11. By this e-mail, Fraudster Styrud explained that "Diamyd" wanted to retain defendant to represent it in a breach of contract action against an entity she identified as "Praxair." [Id.]

12. According to Fraudster Styrud, "Diamyd" ordered goods from "Praxair" for which it paid $633,567.60, but "Praxair" failed to deliver. [Id.]

13. Defendant responded to Fraudster Styrud's February 28 e-mail several hours later, and asked her to send him the "contract" and other documents to review. [Id., (D005)]

14. By e-mail to defendant on Monday March 3, 2014 at 5:34 a.m., Fraudster Styrud responded to defendant's request and attached documents purporting to be the contract between "Diamyd" and "Praxair," correspondence between the companies,

and a wire transcript from "Diamyd" to "Praxair" for payment of goods. [Id., **Ex. 8** (D012-023)]

15. By this e-mail, Fraudster Styrud asked defendant to send a retainer agreement to an individual she identified as "Peter Zerhouni" ("Fraudster Zerhouni"), "Diamyd's" president. [Id.]

16. Never before during his 29-years as a practicing attorney did defendant receive an unsolicited e-mail from a foreign company seeking to retain him. [Id., **Ex. 4** (Freyberg Dep. 34:22-35:3)]

17. Defendant also never previously represented a new client in a commercial debt collection, and only handled such matters 10 times during that period for existing clients. [Id. (Freyberg Dep. 20:11-20; 22:2-11)]

18. By e-mail sent to Fraudster Zerhouni on March 3, 2014, defendant attached a retainer agreement and requested a $5,000.00 retainer. [Id. (Freyberg Dep. 22:2-11); **Ex. 6**]

19. The e-mail address to which defendant sent this e-mail was "ptzerhouni@diiamyd.com," with the company name containing an extra "i." [Id., **Ex. 6**]

20. Defendant prepared and e-mailed the retainer letter himself. Id., **Ex. 4** (Freyberg Dep. 51:11-17; 53:2-5)]

21. Defendant failed to notice the distinction between "diiamyd" and the name of the company, Diamyd. [Id.]

22. By e-mail sent on March 3, 2014, at 11:54 a.m., Fraudster Zerhouni responded to defendant's March 3, 2014 e-mail by returning the signed retainer letter, but no retainer. [Id., **Ex. 7**]

23. Fraudster Zerhouni wrote "[w]e will inform you shortly on when we will remit the Retainer Agreement Fee." [Id., (D009)]

24. The entirety of defendant's investigation of his supposed new client "Diamyd" consisted solely of performing a single Google search and reviewing the real Diamyd's website. [Id., **Ex. 4** (Freyberg Dep. 29:5-12)].

25. Defendant never asked Fraudster Styrud who purportedly referred him to "Diamyd." [Id. (Freyberg Dep. 30:15-17)]

26. Defendant admits he conducted no due diligence into this entity, if at all, until after he learned the Counterfeit Check was returned. "After I learned the whole thing was a scam I started looking hard at all the relevant information." (Id. (Freyberg Dep. 217:8-10)]

27. Defendant claims he spent "approximately an hour and-a-half" reviewing documents Fraudster Styrud sent him. [Id. (Freyberg Dep. 66:12-16; 91:7-18)]

28. Defendant never attempted to nor spoke by telephone with Fraudster Styrud or asked her questions about the documents she sent him. [Id.]

5

29. Defendant never attempted to nor spoke by telephone with Fraudster Zerhouni or anyone at "Diamyd." [Id. (Freyberg Dep. 37:18-20; 38:8-15; 59:16-18)]

30. Defendant never drafted nor sent a demand letter to "Praxair." (Id. (Freyberg Dep. 96:2-7)]

31. On Monday March 3, 2014, Fraudster Zerhouni sent an e-mail to "Vanessa A. John," purportedly the Global Diversity Director for "Praxair," ("Fraudster John") copying defendant. [Id., **Ex. 9**].

32. By the e-mail, Fraudster Zerhouni informed Fraudster John that:

> [O]ur company is at the verge [sic] of retaining the service
> of a lawyer in your Country. With due respect to this
> approach, we will no longer be receiving payment directly
> from your firm, any future refund will be directed to the
> attention of our Attorney.

[Id. (D024)]

33. Fraudster John responded to Fraudster Zerhouni's e-mail the following day, Tuesday, March 4, 2014, copying defendant, by immediately agreeing to settle "Diamyd's" claim:

> [A]fter careful consideration and review, we decided that it
> is in the best interest of our company to settle this dispute
> outside of court and this will save all parties time and cost
> as we intend not to tarnish the image of our company, we
> decided to make the availability of funds on or before
> March 10th 2014.

\* \* \*

> Since we will be making the payment to your Attorney, We would request him to forward to us the below details. We will be remitting a Cashier's Check for part payment of $433,567.60 and schedule to remit the balance on 17th of March 2014 with whatever interest that has been incurred.

[Id. (D025)]

34. Defendant concedes the "time frame" between "Praxair's" receipt of Fraudster Zerhouni's March 3, 2014 e-mail notifying it that "Diamyd" retained an attorney, and "Praxair's" decision to immediately settle the claim the following day was "unusually short." [Id., **Ex. 4** (Freyberg Dep. 95:23-25; 104:23-25)]

35. Defendant forwarded Fraudster John's e-mail to Fraudster Zerhouni fifteen minutes after receiving it, and asked "when I can expect to receive the retainer fee set forth in the agreement we signed yesterday?" [Id., **Ex. 10** (D027)]

36. Fraudster Zerhouni responded fifteen minutes later by instructing defendant "to deduct your retainer fee and any other fee incurred" from the anticipated settlement proceeds defendant would receive from "Praxair" on "Diamyd's" behalf. [Id., **Ex 11** (D030)]

37. Defendant agreed to this arrangement even though "it's the only time [he] can recall" in his career drawing his retainer fee from anticipated settlement proceeds. [Id., **Ex. 4** (Freyberg Dep. 98:2-9)]

38. Defendant responded to Fraudster John's March 4, 2014 e-mail about an hour after receiving it by instructing her to draw the settlement check to the order of "The Freyberg Law Group, As Attorney," and mail it to his firm [Id., **Ex. 11** (D033)]

39. By e-mail dated March 5, 2014, Fraudster John informed defendant that "Praxair's" account department would "process the payment immediately." [Id, **Ex. 12** (D038)]

40. Defendant never attempted to contact any of the fraudsters by telephone or otherwise to discuss (i) drafting a settlement agreement or release, (ii) whether "Praxair" was represented by counsel, or (iii) the manner in which "Praxair" would pay the balance of the debt it owed "Diamyd." [Id., **Ex. 4** (Freyberg Dep. 99-3; 100:10-20; 106:4-9)]

41. Defendant "believed that one party or the other would be drafting a settlement agreement…[and] assumed it would happen at some point in time, that somebody would be drafting." [Id.]

42. Defendant admits "[t]his did strike me as an unusually quick time between the time of my involvement and the path to resolution." [Id., **Ex. 4** (Freyberg Dep. 104:23-25)]

43. On or about March 11, 2014, defendant received a letter from Fraudster John, dated March 6, 2014. [Id., **Ex. 4** (Freyberg Dep. 107:10-14); **Ex. 13** (D042)]

44. The letter enclosed what purported to be an official check remitted by "Praxair," drawn by Canadian Imperial Bank of Commerce ("CIBC") on Bank of New York ("BNY"), in the face amount of $433,567.60 (the "Counterfeit Check"). [Id., **Ex. 4** (Freyberg Dep. 108:9-11); **Ex. 13** (D043)]

45. Fraudster John's letter states that the Counterfeit Check "is a partial settlement payment of ($433,567.60)." [Id., **Ex. 13** (D042)]

46. Defendant admits he was "surprised" the Counterfeit Check appeared to be drawn on a Canadian bank "because there had been no Canadian connection in this matter in any way." [Id., **Ex. 4** (Freyberg Dep. 118:21-119:3)]

47. Defendant did not contact Fraudster John to inquire why a Canadian bank drew the Counterfeit Check (Id., (Freyberg Dep. 119:4-7)]

48. By e-mail to Fraudster John dated March 11, 2014, with a copy to Fraudsters Zerhouni and Styrud, defendant confirmed receipt of the Counterfeit Check. [Id., **Ex. 13** (D041)]

49. On March 11, 2014, defendant received an e-mail from Fraudster Zerhouni instructing him to "go ahead and deposit the check...[p]lease confirm when payment will be available for wire as we will need part of our funds transferred to the firm in Japan." [Id., (D045)]

50. Defendant deposited the Counterfeit Check for credit to the Account on March 12, 2014. [Id., **Ex. 21** (JPMC 039); **Ex. 24** (JPMC 022)]

51. Chase provisionally credited the Account in the amount of the Counterfeit Check. [Id., **Ex. 22** (D119-120); **Ex. 23** (Szygiel Dep. 51:3-8; 54:21-24)]

52.     On March 13, 2014, a provisional credit in the face amount of the Counterfeit Check was posted to the Account in such funds were available for defendant's use. [Id.]

53.     By e-mail dated March 13, 2014, Fraudster Zerhouni instructed defendant to wire $389,950.00 to an account maintained at Towa Bank in Japan in the name of a company identified as Tanaka Isseidon Gaishon (the "Fraudster EFT"). [Id., **Ex. 15** (D059)].

54.     Fraudster Zerhouni insisted the Fraudster EFT be sent that day "as we need their account updated it is very important." [Id.]

55.     Defendant appeared at a Chase branch in Manhattan on March 13, 2014, spoke with Angel Miranda, a Chase private client banker, and instructed him to send the Fraudster EFT. [Id., **Ex. 4** (Freyberg Dep. 175:19-176:9); **Ex. 17**; **Ex. 18**].

56.     Shortly after defendant initiated the wire, Chase made a decision to hold the Fraudster EFT until defendant could provide proof the check would "clear," or until March 26, 2014. [Id., **Ex. 25** (Merrick Dep. 54:23-55:5)]

57.     By voicemail left on defendant's mobile phone on March 13, 2014 at approximately 5:50 p.m, Mr. Miranda informed defendant of Chase's decision. [Id., **Ex. 4** (Freyberg Dep. 183:2-184:9)]

58. On March 14, 2014, defendant appeared at a Chase branch in Chappaqua, New York, and spoke with Joseph Szygiel, a Chase relationship banker. [Id. (Freyberg Dep. 186:12-13)]

59. Defendant requested that the hold on the Fraudster EFT be released. [Id. (Szygiel Dep. 64:14-65:4)]

60. Defendant testified at his deposition as follows:

> I told [Mr. Szygiel] that I had gone into the account [sic] late Thursday [March 13, 2014] and left there believing a wire had been initiated by Angel Miranda whose business card I gave him, and I told him but [sic] shortly after leaving the branch I got a message that the wire department thought a new hold period extending to March 26, or until some form of proof about the underlying deposit could be supplied, was now in place and I was, I was very concerned about the status of this.
>
> * * *
>
> I said this is a most unusual situation. I told him I had been retained over the Internet which never had happened before without having met my client, this is unsolicited, this came to me that way, and when I received what I believe to be a bank check, that I deposited it, that I was told there would be on it till the 20th [sic], that did not make sense to me based on my experience with bank checks, and that the Manhattan branch of Chase had looked into it, had called me back and told me that they would be able to, that they had resolved their concerns, that I could wire funds from my account at that point. I went in the day before, and now there is this new hold, what on earth is going on?

[Id. (Freyberg Dep. 188:7-189:11)]

11

61. Defendant admits he made no attempt to contact Fraudsters Zerhouni, Styrud or John to discuss the hold on the Fraudster EFT. [Id. (Freyberg Dep. 189:12-22; 196:13-19)]

62. Defendant sent Fraudster Zerhouni an e-mail on March 12, 2014, attaching the March 11 Transaction Summary, stating:

> The deposit slip is attached. You will note on the slip that the bank is stating that the funds will be available on March 20. However, I have placed a call to a manager at the bank and expressed my view that this is an unduly long waiting period. I expect to have feedback regarding my complaint by tomorrow, and of course I will keep you informed.

[Id., **Ex. 14** (D051)]

63. Fraudster Zerhouni told defendant to instruct Chase to "make funds available." [Id., **Ex. 16** (D055)]

64. Defendant replied to Fraudster Zerhouni "I am doing my best in that regard, as I indicated in my e-mail." [Id.]

65. On March 14, 2014, Mr. Szygiel reviewed Chase's Customer Assist computer system and confirmed funds were available in the Account to support the Fraudster EFT. [Id., **Ex. 23** (Szygiel Dep. 51:3-8; 54:21-24)]

66. On March 14, 2014, Mr. Szygiel called Chase's Banker Support number in an effort to release the hold on the Fraudster EFT. [Id. (Szygiel Dep. 64:14-65:4)]

67. On March 14, 2014 Mr. Szygiel spoke with a representative of Chase's Operating Loss Prevention department. [Id. (Szygiel Dep. 66:11-17)]

68. Defendant testified at his deposition that he heard Mr. Szygiel's part of the conversation as follows:

> I recall [Mr. Szygiel] saying I have a customer here named Mark Freyberg who is having some concerns about a deposit and a subsequent wire and he read off information from his screen because he had seen on his screen while I was there that the funds were at least labeled available at the time he was looking at his screen, so he discussed all of that. I heard him discuss that.
>
> * * *
>
> Until the very end at which time he said, thank you. He may have used the person's name. He put his thumb up. He gave me the thumbs-up indicator before he hung up and got off the phone, so basically that was the totality.

[Id., **Ex. 4** (Freyberg Dep. 190:24-1918; 191:8-23)]

69. Defendant admits that neither Mr. Szygiel nor any representative of Chase ever told him that Chase received "final settlement" or "final payment" for the Counterfeit Check. "I don't recall specific use of those words…I don't recall the exact words that he used… I don't recall the specific language or words that [Mr. Szygiel] used that day…" [Id. (Freyberg Dep. 232:13-15; 233:5-6; 234:17-18; 242:5-6)]

70. Defendant admits he never told Mr. Szygiel he would not complete the Fraudster EFT unless Chase "confirmed the funds from the [Counterfeit Check] were properly and finally in his account." [Id. (Freyberg Dep. 239:8-19)]

13

71. Defendant filed a complaint with the New York Department of Financial Services in which he represented "I went to a bank branch to confirm availability of funds to support an international wire transfer…[b]ank branch confirmed availability for this purpose…" (Id., **Ex. 30** (JPMC 016)).

72. Upon completion of Mr. Szygiel's telephone call with Chase's Operating Loss Prevention department on March 14, 2014 Chase agreed to defendant's request and released the hold on the Fraudster EFT. [Id., **Ex. 23** (Szygiel Dep. 67:19-21)]

73. On March 14, 2014, Mr. Szygiel telephoned Mr. Miranda to inform him that "there was a hold on the wire, as I am sure you know, and [Mr. Freyberg] just came in. We got it released at his request, and he said okay, thank you, and that was it." [Id. (Szygiel Dep. 73: 17-23)]

74. Chase never received final payment for the Counterfeit Check.

75. On or about Monday, March 17, 2014, BNY returned the Counterfeit Check to Chase unpaid because it was counterfeit. [Id., **Ex. 4** (Freyberg Dep. 211:6-13); **Ex. 21** (JPMC 040)].

76. Defendant admits he received notice from Chase dated March 17, 2014 that the Counterfeit Check was returned. [Id., **Ex. 4** (Freyberg Dep. 207:11-14); **Ex. 19** (D082); **Ex. 20**]

77. Chase made an effort to recall the Fraudster EFT but could not, thereby resulting in the Overdraft. [Id., **Ex. 29** (Byrne Dep. 68: 7-9, 19-24]

78. Chase debited the Account the amount of the provisional credit resulting in the Overdraft. [Id., **Ex. 24**]

79. The Account Agreement governing Chase's relationship with defendant states:

> Although we attempt to identify and prevent fraudulent transactions, we have no duty to you to determine whether any check you deposit or cash is forged, counterfeit, altered, improperly endorsed, or otherwise improper. If you deposit the check in your trust account (including any attorney trust account), we may charge a trust account, an account in your name, or charge part of the check to each.

[Id., **Ex. 22** (D095)]

80. The Account Agreement defines the meaning of funds "availability" as follows:

> "Available balance": Your "available balance" is the balance in your account after deducting (1) deposits that are not yet available for withdrawal under our Funds Availability Policy, (2) debit card or other transactions that we are legally obligated to pay or have already paid out in cash, (3) other pending transactions such as ACH transactions, and (4) any holds on your account, such as holds on funds to comply with court orders or other legal requirements.

[Id. (D093)]

15

81. The Account Agreement states:

> If funds from the deposit become "available" and you can withdraw funds, that does not mean the check or other item you deposited is "good," has "cleared," or has been paid by the paying bank. It's possible that the item will be returned unpaid months after we've made the funds available to you and you've withdrawn them. No one, including our employees, can guarantee you that a check or other item will not be returned.

[Id. (D095)]]

Dated: New York, New York
May 27, 2015

ZEICHNER ELLMAN & KRAUSE LLP

By: _____
Barry J. Glickman
Bruce S. Goodman
Attorneys for Plaintiff
1211 Avenue of the Americas
New York, New York 10036
(212) 223-0400

TO: NEUFELD & O'LEARY
Attorney for Defendant
370 Lexiongton Avenue
New York, New York 10017