UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

JPMORGAN CHASE BANK, N.A.,

                Plaintiff,

-against-

MARK L. FREYBERG, individually and         14-CV-6851
conducting business under the name of        (RMB)
THE FREYBERG LAW GROUP,

                Defendant.
------------------------------------------------------------------X

## DEFENDANT'S RESPONSE AND COUNTER STATEMENT
## TO PLAINTIFF'S RULE 56.1 STATEMENT

Defendant, by his attorneys, NEUFELD & O'LEARY, submit the following response and counter statement to Plaintiff's Rule 56.1 Statement in Support of Motion for Summary Judgment:

1.     Deny, but admit that Defendant Mark L. Freyberg ("Freyberg") has been an attorney in private practice since 1986. (Excerpts of Freyberg Deposition (the "MF Dep."), Ex. "A,"[1] at 14:11-16.)

2.     Admit.

3.     Admit.

4.     Admit.

5.     Admit.

6.     Admit.

7.     Admit.

8.     Admit.

---

[1] All Exhibits are annexed to the June 29, 2015 Affidavit of David Neufeld.

9. Admit.

10. Admit.

11. Deny, but admit that the e-mail from Styrud indicated that "Diamyd" wanted to retain Freyberg to represent it with regard to a breach of contract by an entity identified as "Praxair." (Ex. "B," at D01).

12. Admit.

13. Admit.

14. Admit.

15. Admit.

16. Admit.

17. Deny, but admit that Freyberg had handled approximately ten commercial debt collection matters during his career and testified that he could not recall doing so for a new client. (MF Dep., Ex. "A", at 20:11-22).

18. Admit.

19. Admit.

20. Admit.

21. Admit.

22. Admit.

23. Admit.

24. Deny. Freyberg performed a Google search of Diamyd Medical, reviewed its website, reviewed documents provided to him by e-mail and undertook Internet research to confirm certain information provided to him by "Ana Styrud," including the existence of Praxair. (Affidavit of Mark L. Freyberg, sworn to June 29, 2015 (the "Freyberg

Aff.") at ¶ 3; MF Dep., Ex. "A," at 29:5-12, 37:22-38:3, 40:9-20, 63:7-65:9, 71:20-25; See Ex. "C," at D167-68).

    25.    Admit.

    26.    Deny. Prior to March 17, 2014 the date the deposited check was returned, Freyberg performed a Google search of Diamyd Medical, reviewed its website, reviewed documents provided to him by e-mail and undertook Internet research to confirm certain information provided to him by "Ana Styrud," including the existence of Praxair. (Freyberg Aff. at ¶ 3; MF Dep., Ex. "A," at 29:5-12, 37:22-38:3, 40:9-20, 63:7-65:9, 71:20-25; See Ex. "C," at D167-68).

    27.    Admit.

    28.    Admit.

    29.    Admit.

    30.    Admit.

    31.    Deny, as Zerhouni's e-mail did not identify Vanessa A. John as Praxair's Global Diversity Director. (Ex. "B," at D024).

    32.    Admit.

    33.    Admit.

    34.    Admit.

    35.    Deny, as this Statement contains only a partial quote of Freyberg's e-mail. (Ex. "B," at D027.)

    36.    Admit.

    37.    Admit.

    38.    Admit.

39. Admit.

40. Deny, as multiple communications between Freyberg and "Praxair" referenced the drafting of settlement agreements and releases and the payment date for the remainder of the funds owed to "Diamyd" by "Praxair." (See Ex. "B," at D025, D027, D033, D042; MF Dep., Ex. "A," at 100:7-12).

41. Admit.

42. Admit.

43. Admit.

44. Admit.

45. Admit.

46. Admit.

47. Admit.

48. Admit.

49. Admit.

50. Deny. Freyberg deposited the Check with Plaintiff J.P. Morgan Chase Bank, N.A. ("Chase") on March 11, 2014, at which time he was provided a Transaction Summary which stated that the funds would not be available until March 20, 2014. Chase thereafter contacted Freyberg on March 11, 2014 and indicated that an error had been made in the account number endorsed on the Check by Freyberg. On March 12, 2014, Chase deposited the Check into Freyberg's operating account. (Freyberg Aff. at ¶ 7; Ex. "D"; MF Dep., Ex. "A," at 132:19-133:19).

51. Deny. Freyberg objects to this statement pursuant to Fed R. Civ. Pro. 56(e) and Local Civil Rule 56.1 as Chase has failed to cite to admissible evidence to support this

statement, and neither of the documents cited by Chase evidence this proposition. On March 13, 2014, Chase indicated that the concerns which Chase had identified on its March 11, 2014 Transaction Summary had been resolved by Chase and that Freyberg would be able to wire the funds that day. However, on March 13, 2014, Chase did not permit Freyberg to wire the funds on that day. (Freyberg Aff. at ¶¶ 10, 12; MF Dep., Ex. "A," at 159:14-160:5; transcript of voicemail of Angel Miranda ("Miranda"), Ex. "E").

52.  Deny. Freyberg objects to this statement pursuant to Fed R. Civ. Pro. 56(e) and Local Civil Rule 56.1 as Chase has failed to cite to admissible evidence to support this statement, and neither of the documents cited by Chase evidence this proposition. On March 13, 2014 Chase indicated that the concerns which Chase had identified on its March 11, 2014 Transaction Summary had been resolved by Chase and that Freyberg would be able to wire the funds that day. However, on March 13, 2014 Chase did not permit Freyberg to wire the funds on that day. (Freyberg Aff. at ¶¶ 10, 12; MF Dep., Ex. "F," at 159:14-160:5; Ex. "E").

53.  Admit.

54.  Admit.

55.  Admit.

56.  Admit and affirmatively allege that Chase Fraud Analyst Ethan Merrick ("Merrick"), who made this determination, testified that "clear" meant that "there is no possibility that the Check will return." (Excerpts of Deposition of Merrick (the "EM Dep."), Ex. "H," at 54:23-55:8).

57.  Deny. On March 13, 2014, Miranda left a voicemail which stated that, inter alia, Chase's wire department was concerned because the Check had been deposited the

5

previous day, the wire would be held until the wire department received proof that the Check was "good" and indicated that Chase had undertaken to obtain this proof by attempting to contact Bank of New York Mellon. (Freyberg Aff. at ¶ 12; Ex. "E".)

58. Admit.

59. Deny.  On March 14, 2014 Freyberg inquired of Chase concerning Miranda's voicemail and the status of the wire transfer. (Freyberg Aff. at ¶¶ 13, 14; MF Dep., Ex. "A," at 188:7-189:11).

60. Deny, but admit that this contains a partial quote of testimony given by Freyberg during his deposition (MF Dep., Ex. "A," at 188:7-189:11).

61. Admit.

62. Admit.

63. Deny. The e-mail requested that Freyberg inquire whether Chase could make funds available prior to the March 20, 2014 date indicated on the March 11, 2014 Transaction Summary. (Ex. 16 to Declaration of Barry J. Glickman, dated May 27, 2015 (ECF No. "49") at D055).

64. Admit.

65. Admit.

66. Admit that Szygiel called Chase's Banker Support and that Mr. Szygiel testified that his purpose in doing so was to release the hold on the wire transfer.

67. Admit.

68. Admit.

69. Deny. Freyberg objects to this statement of fact pursuant to Fed R. Civ. Pro. 56(e) and Local Civil Rule 56.1 as Chase has failed to cite to admissible evidence to

support this statement. The deposition testimony cited by Chase in its 56.1 Statement indicates only that Freyberg does not recall the exact words utilized by Szygiel. Freyberg also testified that Chase had indicated to him that "in, sum and substance, that all of the concerns expressed by the wire department . . . had been satisfied; that the check had been verified and that the funds were in my account to support the wire." (MF. Dep., Ex. "A," at 232:19-24).

70. Deny. Freyberg objects to this statement of fact pursuant to Fed R. Civ. Pro. 56(e) and Local Civil Rule 56.1 as Chase has failed to cite to admissible evidence to support this statement. In the testimony cited by Chase, Freyberg testified only that he did not recall whether he specifically used the words "properly" or "finally" in communicating to Chase that he did not want to initiate the wire transfer unless funds were in his account. (MF Dep., Ex. "A," at 239:8-19).

71. Admit.

72. Deny that Freyberg requested that Chase release the wire, but admit that Chase released the wire after Szygiel's telephone conversation with Chase's Operating Loss Prevention department. (MF Dep., Ex "A," at 188:7-189:11).

73. Deny that this is an uncontroverted fact, as Miranda testified that he did not recall speaking with anyone at the Chappaqua branch regarding the wire transfer. (Excerpts of Miranda Deposition, "AM Dep.," Ex. "F" at 102:22-103:5).

74. Admit.

75. Admit.

76. Admit.

77. Admit.

7

78. Deny, but admit that Chase debited Freyberg's account in the amount of the Check.

79. Admit.

80. Admit that the text quoted is contained in the Account Agreement.

81. Admit.

## ADDITIONAL MATERIAL FACTS WHICH SUPPORT THE DENIAL OF PLAINTIFF'S MOTION AND A GRANT OF SUMMARY JUDGMENT TO DEFENDANT

1. Freyberg was admitted to practice law in 1982 and has been in private practice since 1986. (MF Dep., Ex. "A," at 13:14-19; 14:11-16.)

2. During March 2014, Freyberg was contacted by a person identifying himself as the Chief Financial Officer of Diamyd Medical AB, a Swedish company, seeking to retain Freyberg's services in a commercial dispute with an entity identified as "Praxair." (Ex. "B," at D01).

3. After exchanging preliminary e-mails, Freyberg forwarded a proposed retainer letter to the new client who executed and returned the same. (Ex. "B," at D07-10).

4. Freyberg received a copy of an e-mail purportedly addressed by his new client to Praxair, which indicated that it had retained Freyberg. (Ex. "B," at D024).

5. Shortly thereafter, Freyberg received a copy of an e-mail purportedly from Praxair agreeing to settle the claim by two payments, with the first to be made by a cashier's check of $433,567.60. (Ex. "B," at D025-26).

6. On March 11, 2014, Freyberg received a check (the "Check") purportedly from Praxair drawn by its bank, Canadian Imperial Bank of Commerce ("CIBC"), on an account at the Bank of New York ("BNY"). (Ex. "B," at D042-43).

8

7.  Freyberg deposited the Check at Chase on March 11, 2014 (MF Dep., Ex. "A," at 124:11-24).

8.  The Transaction Summary which Chase provided indicated that the proceeds of the Check would not be available until March 20, 2014 and that:

> Checks within this deposit may not be paid because of information we've received from the paying bank or due to information we have within our own systems.

(See Ex. "D").

9.  This is the only Transaction Summary which Freyberg received from Chase in connection with the deposit of the Check. (Freyberg Aff. at ¶8).

10. On March 12, 2014, Freyberg called Chase to inquire as to the reasons for the delay. (Freyberg Aff. at ¶ 9; MF Dep., Ex. "A," at 157:6-20).

11. Chase did not provide this information but instead, on March 13, 2014, a Chase representative informed Freyberg that its concerns expressed on the Transaction Summary had been addressed and that the Funds could be wired from his account. (Freyberg Aff at ¶ 10; MF Dep., Ex. "A," at 159:14-160:5).

12. Later on March 13, 2014 Freyberg went to a Chase branch in Manhattan and met with a Chase's representative, Miranda, who arranged to initiate a wire transfer of a portion of the Check proceeds. (Freyberg Aff. at ¶ 11; MF Dep., Ex. "A," at 175:19-176:13).

13. Approximately one hour later Miranda telephoned Freyberg and left a voicemail indicating that Chase's wire department had determined that the wire could not be sent for ten business days absent "proof" that the Check was "good." (Freyberg Aff. at ¶ 11; Voicemail transcript, Ex. "E,"; "AM Dep.", Ex. "F," at 88:16-89:10).

14. Amy Byrne ("Byrne"), Chase's designated 30(b)(6) witness testified that "good" refers to a check which "has actually gone through and has not been counterfeit and funds have been paid by the drawee bank. And there are no stops and holds on it." (Excerpts of Byrne Deposition (the "AB Dep."), Ex. "G," at 204:15-205:3).

15. Chase Fraud Analyst Ethan Merrick ("Merrick") testified that the term "good" meant that it was "a legitimately-issued check and that it will clear and will not return," which Chase's 30(b)(6) witness confirmed in sum and substance. (EM Dep., Ex. "H," at 71:5-10).

16. Freyberg understood "good" to including it being confirmed that the Check was "what it purported to be." (Freyberg Aff. ¶ 12; MF Dep., Ex. "A", at 230:8-18).

17. Chase's account agreement provides that:

> If funds from a deposit become "available" and you can withdraw funds, that does not mean the check or other item you've deposited is "good," has "cleared," or has been paid by the paying bank.

(Ex. "I," at JPMC 060).

18. Chase's purpose in making this notification was to inform Freyberg that Chase would hold the wire ". . . to allow sufficient time for the bank on which the check was drawn either to make final payment or to dishonor the check." (Chase's First Request for Admissions at ¶ 11 and Freyberg's Response, Ex. "J".)

19. The following morning, March 14, 2014, Freyberg went to Chase's Chappaqua branch to inquire about the status of the transaction and Miranda's voicemail, and met with Chase Relationship Banker Joseph Szygiel ("Szygiel"). (Freyberg Aff. at ¶¶ 13, 14; MF Dep., Ex. "A," at 184:22-185:5, 186:9-13).

20. Szygiel's duties were to communicate with customers, respond to their questions and provide requested assistance and information. (Excerpts of Szygiel Deposition (the "JS Dep."), Ex. "K," at 5:22-6:6.)

21. Freyberg gave Miranda's business card to Szygiel and explained to Szygiel that Miranda had informed him that the wire had been held pending confirmation that the Check was good, and Freyberg requested information concerning the status of the Check and wire. (Freyberg Aff. at ¶ 14; JS Dep., Ex. "K," at 42:4-6; MF Dep., Ex. "A," at 188:7-189:11).

22. Freyberg further explained that he had never met his new client and he had been retained over the internet and that the funds needed to be properly collected before any transfer took place. (Freyberg Aff. at ¶ 14; MF Dep., Ex. "A," at 188:7-189:11, 233:17-22).

23. Freyberg was courteous and cordial to Szygiel throughout their interaction. (JS Dep., Ex. "K," at 45:2-8).

24. Szygiel telephoned Jacqueline Welch ("Welch") of Chase's Deposit Loss Prevention Department to obtain the requested information. (JS Dep., Ex. "K," at 70:16-24).

25. When Szygiel's telephone communications ended after approximately forty minutes, he gave Freyberg a "thumbs up," informed him that Chase's concerns had been satisfied, the funds were in his account and the wire would be sent. (Freyberg Aff. at ¶ 16; MF Dep., Ex. "A," at 191:18-192:25, 232:19-24).

26. On March 17, 2014, Freyberg learned that his account had a significant negative balance, as the Check had been returned (MF Dep., Ex. "A," at 201:4-8).

27.	Byrne, the manager of the Chappaqua Branch, reviewed the matter on March 17, 2014 and, during her conversation with Chase's Customer Claims Office that day, indicated that Chase's Deposit Loss Prevention Team had admitted to her that the person who verified the Check "did not do it right" as "she was supposed to make sure that the check was cleared" but that it had not cleared.  (Transcript of March 17, 2014, 4:43 p.m. audio produced by Chase, Ex. "L".)

28.	Byrne acknowledged to Chase's Customer Claims Office that she did not disclose to Freyberg the information imparted to her by Chase's Deposit Loss Prevention Team that the person who verified the Check did not do it right.  (Transcript of March 17, 2014, 4:43 p.m. audio produced by Chase, Ex. "L".)

29.	On March 13, 2014, Chase's computer system identified the proposed wire as indicative of a suspected fraud.  (EM Dep., Ex. "H," at 56:24-57:14.

30.	On March 13, 2014, the transaction was examined by Merrick "for any scams or fraud" and to determine whether the wire should be processed.  (EM Dep., Ex. "H," at 36:13-22).

31.	On March 13, 2014, CIBC informed Merrick that it did not verify checks by phone.  (EM Dep., Ex. "H," at 41:11-42:4).

32.	On March 13, 2014, Merrick concluded that he was unable to determine that the Check was valid based upon numerous factors including his unsuccessful attempt to verify the authenticity of the Check with the issuing bank (CIBC), and other factors from which he determined that "... none of it really made sense to me at all."  (EM Dep., Ex. "H," at 44:5-25).

12

33. On March 13, 2014, Merrick classified this as a "high risk transaction" which involved a "suspected fraud." (AB Dep., Ex. "G," at 145:17-24; EM Dep., Ex. "H," at 67:2-16).

34. Merrick imposed a ten business day hold pursuant to Fraud Department policy. (EM Dep., Ex. "H," at 45:1-8).

35. Merrick determined that the hold must remain in place for ten business days unless, as Merrick testified, the customer (Freyberg) could verify that the check was valid, not "fraudulent" and "had no possibility of being returned." (EM Dep., Ex. "H," at 37:24-38:19).

36. Merrick placed a hold on fewer than 10% of the wire transfers that he reviewed. (EM Dep., Ex. "H," at 8:19-9:5).

37. No one from Chase ever informed Freyberg that its computer system had identified the transaction as involving a likely fraud. (Freyberg Aff. at ¶ 19; AM Dep., Ex. "F," at 82:11-17; JS Dep., Ex. "K," at 79:6-24, MF Dep., Ex. "A," 191:18-192:25, 232:19-24).

38. Chase never informed Freyberg that the transaction had been reviewed by a Fraud Analyst who had concurred with the computer system's determination that the transaction as likely fraudulent. (Freyberg Affidavit at ¶ 19; AM Dep., Ex. "F," at 82:11-17; JS Dep., Ex. "K," at 79:6-24, MF Dep., Ex. "A," 191:18-192:25, 232:19-24).

39. Freyberg was not apprised of Merrick's determinations that the transaction was "high risk" or likely fraudulent. (Freyberg Aff. at ¶ 19; Ex. "F"; AM Dep., Ex. "F," at 82:11-17).

40. On March 13, 2014, Miranda informed Freyberg that the wire had been held due to the wire department's concern "that the check was just deposited and it [the wire] went out today." (Freyberg Aff. at ¶ 21; Ex. "E").

41. Szygiel never informed Freyberg that Chase suspected the transfer was fraudulent. (Freyberg Aff. at ¶ 19; JS Dep., Ex. "K," at 66:11-18).

42. On March 14, 2014, Welch called BNY, the payor bank, which expressly told her that it could not confirm whether the Check had been paid. (Transcript of Audio produced by BNY, Ex. "M").

43. On March 14, 2014, Welch allowed the funds to be released. (JPMC 50, Ex. "N".)

44. On March 14, 2014, Chase employee Julie Keener ("Keener") authorized the wire on the grounds that "funding" had been "confirmed." (Ex. "N".)

45. A telephone verification of the type undertaken by Welch cannot identify a fraudulent check. (See Ex. "O," at JPMC 90, Gavin Matranga's entry dated March 31, 2014, 6:00:44).

46. Chase never contacted Merrick, who had placed the hold on the wire transfer, before the hold was removed and the wire was effectuated. (EM Dep., Ex. "H," at 76:7-77:3).

47. Merrick learned the hold had been lifted when he unsuccessfully attempted to check on the status of the transaction. (EM Dep., Ex. "H," at 77:11-78:14).

48. Chase had actual knowledge of fifteen other cases in which checks purporting to be remitted by "Praxair" had been utilized to scam Chase customers, most of which were "recent, (within past few months) and involved an attempted scam on a

14

law office." (See Ex. "O," at JPMC 090, entry of Gavin Matranga dated 4/1/2014, 09:47:29 AM).

49. The first page of search results of a Google search of the name "Diamyd" conducted on May 28, 2015 does not include the article attached to the Declaration of Barry Glickman dated May 27, 2015 as Exhibit "26." (Ex. "P").

50. The Wire Transfer Outgoing Request form which initiated the wire provides that any obligation of Freyberg to indemnify Chase for damages incurred in connection with the wire transfer did not apply where Chase was grossly negligent and/or engaged in willful misconduct. (Ex. "Q" at JPMC043).

51. On or about March 17, 2014, Freyberg informed Byrne that he would consider litigation against Chase regarding the wire. (Ex. "O," at JPMC 088, March 18, 2014 entry of Theresa A. Kirk).

52. On or about March 20, 2014, Chase received a spoliation notice from Freyberg's counsel. (Ex. "R").

53. On or about April 13, 2014, Chase destroyed audio recordings of a telephone call between Merrick and Miranda and of a telephone call between Merrick and CIBC. (Ex. "S").

54. On or about April 14, 2014, Chase destroyed audio recordings of two phone calls between Welch and BNY. (Ex. "S").

55. Byrne testified that she reviewed a second Transaction Summary dated March 12, 2014 with regard to the deposit of the Check. (AB Dep., Ex "G," at 173:2-24; 175:2-14).

15

56. Chase failed to produce the March 12, 2014 Transaction Summary and indicated that it had "performed a diligent search and has not identified responsive documents." (See Defendant's Fourth Request for Production and Plaintiff's Response, Ex. T").

57. Section I.11 of Chase's Account Agreement, which provides that:

> **Pre-Judgment Interest Rate**
> If either you or we are awarded a judgment against the other in connection with your account, the rate of interest earned before judgment on the judgment amount will be the rate of interest the account earned during that period unless state law requires a different rate. If the account is not interest-bearing, the rate will be the lowest generally available rate for a personal interest-bearing checking account.

(Ex. "I," at JPMC 073).

58. The lowest generally available rate for a personal interest-bearing checking account offered by Chase is 0.01%. (Ex. "U").

Dated: New York, New York
       June 29, 2015

                        Respectfully submitted,

                        NEUFELD & O'LEARY

By: _____
David S.J. Neufeld, Esq.
Attorneys for Defendant
370 Lexington Avenue, Suite 908
New York, New York 10017
(212) 986-0999

TO: Barry J. Glickman, Esq.
     Attorneys for Plaintiff
     Zeichner Ellman & Krause, LLP
     1211 Avenue of the Americas
     New York, New York 10036