UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JPMORGAN CHASE BANK, N.A.,

                 Chase,

    -against-                                   14-CV-6851 (RMB)

MARK L. FREYBERG, individually and
conducting business under the name of
THE FREYBERG LAW GROUP,

                Defendant.
-----------------------------------------------------------x

# MEMORANDUM OF LAW
# IN FURTHER SUPPORT OF DEFENDANT'S
# CROSS-MOTION FOR SUMMARY JUDGMENT

                                               NEUFELD & O'LEARY
                                               Attorneys for Defendant
                                               370 Lexington Avenue, Suite 908
                                               New York, New York 10017
                                               (212) 986-0999

Of Counsel:
    David S.J. Neufeld, Esq.
    Michael Giusto, Esq.

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...................................................................................... ii

**POINT I**
Chase Misrepresents Freyberg's Position ........................................................ 1

**POINT II**
The Undisputed Facts Require
Summary Judgment in Freyberg's Favor ......................................................... 2

**POINT III**
Chase Breached Its Obligation to Freyberg .................................................... 4

   a. Chase Affirmatively Acted to Conceal
      its Knowledge of a Likely Fraud ............................................................ 5

   b. Chase's Silence Also Supports
      the Application of Equitable Estoppel .................................................... 6

**POINT IV**
Chase Fails to Substantively
Address Freyberg's Counterclaims ................................................................... 7

   a. Negligent Misrepresentation ................................................................. 7
   b. Fraudulent Misrepresentation ............................................................... 8
   c. Expedited Funds Availability Act ("EFAA") ........................................ 8
   d. UCC Bad Faith ....................................................................................... 8

**POINT V**
Chase's Positions Regarding
Discovery Are Disingenuous .............................................................................. 9

**POINT VI**
Parties May Modify
Statutory Interest Rates ..................................................................................... 10

CONCLUSION ......................................................................................................... 10

## TABLE OF AUTHORITIES

**Cases**                                                                                                         **Page(s)**

Board of Mgrs. of 25th Charles St. Condo. v. Seligson,
  126 A.D.3d 547(1st Dep't 2015)..................................................................................10

Bruce Supply Corp. v. D&M Plumbing & Heating Corp.,
  291 A.D.2d 525 (2d Dep't 2002).................................................................................10

Columbia Broad. Sys., Inc. v. Stokely-Van Camp, Inc.,
  522 F.2d 369 (2d Cir. 1975).........................................................................................6

Fischer & Mandell v. Citibank, N.A.,
  2009 WL 1767621 (S.D.N.Y. 2009).............................................................................8

General Elec. Capital Corp. v. Armadora, S.A.,
  37 F.3d 41 (2d Cir. 1994).............................................................................................6

Greenberg, Trager & Herbst, LLP v. HSBC Bank, USA,
  17 N.Y.3d 565 (2011)...................................................................................................7

In re Sharp International Corp.,
  302 B.R. 760 (E.D.N.Y. 2003).....................................................................................7

Intellivision v. Microsoft Corp.,
  484 Fed.Appx. 616 (2d. Cir. 2012) (Summary Order)...............................................10

Katz v. Colonial Life Ins. Co. of Am.,
  951 F.Supp. 36 (S.D.N.Y. 1997)..................................................................................6

Manufacturers Hanover Trust Co. v. Yanakas,
  7 F.3d 310 (2d Cir. 1993).............................................................................................8

New Hampshire v. Maine,
  532 U.S. 742 (2001)...................................................................................................10

Price v. Fox Ent'mt Group, Inc.,
  2007 WL 241387 (S.D.N.Y. Jan. 26, 2007).................................................................6

Richard Green (Fine Paintings) v. McClendon,
  262 F.R.D. 284 (S.D.N.Y. 2009).................................................................................9

Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.
v. Coventry First LLC,
  280 F.R.D. 147 (S.D.N.Y. 2012).................................................................................5

Silverman Partners, L.P. v. First Bank,
  687 F.Supp.2d 269 (E.D.N.Y. 2010) ..........................................................................4

US Bank Nat. Ass'n v. Dexia Real Estate Capital Mkts.,
  2014 WL 4290642 (S.D.N.Y. 2014).........................................................................10

United States v. Gotti,
  457 F.Supp.2d 395 (S.D.N.Y. 2006)...........................................................................3

**Statutes**

12 USC § 4003(c) ...................................................................................................8

**Federal Rules**

Fed. R. Civ. Pro. 36(b)............................................................................................3

Fed. R. Ev. 801(d)(2)(D) .........................................................................................4

Fed. R. Ev. 803(6) ...............................................................................................3, 4

Fed. R. Ev. 902(11) .................................................................................................3

## Point I
## Chase Misrepresents Freyberg's Position

At his deposition, Chase Fraud Analyst Ethan Merrick ("Merrick") confirmed that he had determined that the transactions at issue herein were likely fraudulent:

> Q: The very first line of the – this paragraph – do you see where it says, "Suspected fraud"? (Referring to JPMC 050, Ex. "N").
> A: Yes.
> Q: Is that a determination which you made?
> A: Yes (EM Dep., Ex. "H," at 67:2-8).

Merrick also testified that the very fact that the wire was referred to him was the result of a determination that it involved a suspected fraud:

> Q: Was the fact that this wire was made available to you in your review indicative of any suspected fraud?
> A: Yes.
> Q: How is it indicative of a suspected fraud?
> A: The wires that outsource to us have been predetermined as having a higher – or a higher than – have a suspicion of fraud on them. (EM Dep., Ex. "H," at 56:24-57:8).

Chase's 30(b)(6) witness Amy Byrne confirmed that Merrick had determined that the transaction was "high risk." (ECF Nos. 57 and 66 at ¶ 33).

Merrick's conclusions were based upon numerous factors relating to the Check deposit and the wire (See ECF No. 58 at pp. 4-5 and testimony cited therein). It is uncontroverted that, as a result, Merrick placed a hold on the wire pursuant to Chase policies which, very shortly thereafter, Chase cavalierly disregarded.

Yet, Chase vigorously refutes its knowledge of the likely fraud as "incorrect"; a "distortion"; "incredible"; "untrue"; "incendiary"; "manufactured"; "an alternate reality" and "pure fiction" (See ECF No. 65 at pp. 2-3). In doing so, Chase misrepresents Freyberg's position, asserting that he maintains that Merrick delayed the wire transfer due to his prior

knowledge of the Praxair fraud. While Chase's investigation file does, in fact, reveal that it recently had been subjected to 15 attempted frauds involving purported Praxair checks,[1] Freyberg does not assert that Chase's knowledge of Praxair triggered the hold, or that this knowledge alone renders Chase's conduct improper. Chase constructs this straw man argument in a clear attempt to evade Chase's own determination that a likely fraud was afoot, which it failed to disclose and then completely ignored when releasing the wire.

### Point II
### The Undisputed Facts Require Summary Judgment in Freyberg's Favor

The following facts are undisputed:[2]

a. On March 13, 2014 Chase employee Angel Miranda ("Miranda") assisted Freyberg in submitting a request to wire funds from his account (¶ 12).

b. Chase's computers identified the proposed wire as indicative of a suspected fraud and, as a result, Merrick examined the transaction "for any scams or fraud" and to determine whether the wire should be processed (¶ 29 - 30).

c. Merrick was unable to determine that the Check was valid. Numerous factors, including his unsuccessful attempt to verify the authenticity of the Check with the issuing bank (CIBC), led Merrick to conclude that "... *none of it really made sense to me at all*" (¶ 32).

d. Merrick classified the transaction as "*high risk*" and a "*suspected fraud*" and imposed a ten business day hold pursuant to Chase policy (¶ 33-34).

e. Merrick determined that the hold would remain in place unless Freyberg could verify that the Check was valid, not "*fraudulent*" and "*had no possibility of being returned*" (¶ 35).

f. Miranda's March 13 voicemail for Freyberg stated that the wire could not be sent for 10 business days absent "proof" that the Check was "good" (¶ 13; Ex. "E").

---

[1] See Ex. "O" at JPMC 090, entry of Gavin Matranga dated 4/1/2014, 09:47:29 AM.
[2] Paragraphs from Freyberg's 56.1 Statement and Chase's response (ECF Nos. 57, 66).

g.  Chase imposed the hold ". . . to allow sufficient time for the bank on which the check was drawn either to make final payment or to dishonor the check" (¶ 18; Chase's First Request for Admissions at ¶ 11 and Freyberg's Response, Ex. "J").[3]

h.  Amy Byrne ("Byrne"), Chase's 30(b)(6) witness, testified that "good" refers to a check which "has actually gone through and has not been counterfeit and funds have been paid by the drawee bank. And there are no stops and holds on it" (¶ 14; AB Dep., Ex. "G," at 204:15-205:3).[4]

i.  Merrick testified that he understood the term "good" to mean that the Check was "a legitimately-issued check and that it will clear and will not return" (¶ 15).

j.  Freyberg understood "good" to include confirming that the Check was "what it purported to be" (¶ 16).

k.  Chase never informed Freyberg that (1) it suspected the transfer was fraudulent; (2) its computers had identified the transaction as involving a likely fraud; (3) Merrick reviewed the transaction and concurred with the computer's determination of a likely fraud; or (4) Merrick had determined that the transaction was "high risk" or likely fraudulent (¶ 37-39, 41).[5]

l.  Instead, Miranda told Freyberg the wire had been held due to Chase's concern "that the check was just deposited and it [the wire] went out today" (¶ 40).

m.  On March 14, Freyberg explained to Chase employee Joseph Szygiel that he had never met his client, he had been retained over the internet and that he needed the funds to be properly collected prior to any transfer (¶ 22).

n.  On March 14, Jacqueline Welch ("Welch") called BNY, and was expressly told that it could not confirm whether the Check had been paid (¶ 42; AEx. "M").[6]

---

[3] Freyberg admitted this allegation in response to Chase's request and it is therefore "conclusively established" for purposes of this action. Fed. R. Civ. Pro. 36(b).

[4] The accuracy of the quoted testimony is uncontroverted. Instead, Chase proffers Byrne's testimony that the term "good" has no "legal significance" (ECF No. 66 at ¶ 14).

[5] Chase does not dispute that it did not provide this information to Freyberg, asserting only that it had no duty to do so (ECF No. 66 at ¶¶ 37-39, 41).

[6] While Chase asserts that BNY told Welch only that it does not confirm check payment as a matter of policy, Ex. "M" speaks for itself and is admissible as a record of a regularly conducted activity. Fed. R. Ev. 803(6) and 902(11). Moreover, it is not offered for its truth, but for its effect on Welch, namely that BNY did not confirm that the Check had been paid. See United States v. Gotti, 457 F.Supp.2d 395, 397 (S.D.N.Y. 2006).

3

o.  Thereafter, Welch recommended that the hold be released, and Julie Keener ("Keener") approved the removal of the hold (¶¶ 43-44).[7]

p.  After the Check was returned Byrne informed Chase's Customer Claims Office that Chase's Deposit Loss Prevention Team had admitted to her that the person who verified the Check "*did not do it right*" as "*she was supposed to make sure that the check was cleared*" but that it had not cleared (¶ 27).

q.  Welch's telephone verification could not identify a fraudulent check (¶ 45, See Ex. "O," at JPMC 90, Gavin Matranga's entry dated March 31, 2014, 6:00:44).[8]

r.  Chase had actual knowledge of 15 other cases in which purported Praxair checks were utilized to scam Chase customers, most of which were "*recent, (within past few months) and involved an attempted scam on a law office*" (See Ex. "O," at JPMC 090, entry of Gavin Matranga dated 4/1/2014, 09:47:29 AM).[9]

In light of these undisputed facts, the cases relied upon by Chase, including Greenberg and Fischer & Mandell, concern whether a bank has a duty to detect a counterfeit check and are therefore inapplicable. The issue here is Chase's duty to disclose a fraud it had actually detected, and its reckless disregard of such knowledge.[10]

## Point III
### Chase Breached Its Obligations to Freyberg

The undisputed facts evidence Chase's affirmative misconduct and failure to disclose information in its possession to Freyberg. Chase must therefore be equitably estopped from charging back Freyberg's account.

---

[7] JPMC 050 is admissible as an opposing party statement. Fed. R. Ev. 801(d)(2)(D).
[8] Chase disputes this allegation, yet Matranga's note speaks for itself (ECF No. 66 at ¶ 45). The document is admissible as a record of a regularly conducted activity and as statements of an opposing party. Fed R. Ev. 801(d)(2)(D); 803(6).
[9] While Chase disputes this allegation, the document speaks for itself. The document is admissible as an opposing party statement. Fed. R. Ev. 801(d)(2)(D).
[10] Silverman Partners, L.P. v. First Bank, 687 F.Supp.2d 269, 281 (E.D.N.Y. 2010) also concerns a bank's duty to detect a fraud, not to disclose and heed a fraud it had detected.

4

a. <u>Chase Affirmatively Acted to Conceal its Knowledge of a Likely Fraud</u>

Equitable estoppel applies to both the concealment of facts and a false misrepresentation. <u>Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC</u>, 280 F.R.D. 147, 163 (S.D.N.Y. 2012). Chase twice determined that the transaction at issue involved a likely fraud. Yet, when Chase notified Freyberg that the wire had been held, it concealed this information and instead falsely told Freyberg that the hold was based on the recent date of the Check deposit. (Freyberg Aff. at ¶ 21; Ex. "E").

Thereafter, Chase's affirmative misrepresentations and concealment continued. It told Freyberg the wire would be held for ten business days absent proof that the Check was "good," which meant, in essence, that the Check was legitimate and would not be returned (AB Dep., Ex. "G," at 204: 15-205-3; EM Dep., Ex. "H," at 71:5-10).[11] Accordingly, Freyberg understood that Chase was obtaining proof that the Check was "what it purported to be" (Freyberg Aff. at ¶ 12; MF Dep., Ex. "A," at 230:8-18).

It is uncontroverted that before the wire was released Freyberg informed Chase that he needed the funds to be properly collected before any transfer (ECF Nos. 57 and 66 at ¶ 22). Yet, unbeknownst to Freyberg, Chase did not obtain proof that the Check was "good," but instead released the wire hold after BNY stated that it could <u>not</u> verify payment of the Check. Chase continued to misrepresent and conceal when its employee Szygiel gave Freyberg a "thumbs up," and informed him that Chase's concerns had been satisfied, that the funds were in his account, and that the wire could therefore be sent. (Freyberg Aff. at ¶ 16; MF Dep., Ex. "A," at 191:18-192:25, 232:19-24).

---

[11] Chase's Account Agreement also indicates that the term "good," means more than that the funds are available. (ECF Nos. 57, 66 at ¶ 17; Ex "I," at JPMC 60).

5

Chase knew that Freyberg would rely on these incomplete and false assurances. Chase also knew that it had withheld its determination that the transaction was a likely fraud, and that funds remained uncollected at the time it released the wire. It should therefore be equitably estopped from imposing the loss upon Freyberg.[12]

### b. Chase's Silence Also Supports the Application of Equitable Estoppel

Assuming, arguendo, that Chase's misstatements do not constitute affirmative concealment, its failure to disclose its determination of a likely fraud also triggers equitable estoppel. A party will be equitably estopped by its own silence where it either had "a duty to speak" or knew that "the other party was acting under a mistaken belief." See Katz v. Colonial Life Ins. Co. of Am., 951 F.Supp. 36, 41 (S.D.N.Y. 1997); General Elec. Capital Corp. v. Armadora, S.A., 37 F.3d 41, 45 (2d Cir. 1994). The duty to speak need not be a purely legal one, but can be "founded in principles of ethics and good faith." Columbia Broad. Sys., Inc. v. Stokely-Van Camp, Inc., 522 F.2d 369, 378 (2d Cir. 1975); Price v. Fox Ent'mt Group, Inc., 2007 WL 241387 at *4 (S.D.N.Y. 2007).

Chase told Freyberg that it would not release the wire absent proof that the Check was "good," and it undertook to obtain such proof. Moreover, Freyberg stated that the funds must be properly collected before any transfer. Yet, Chase released the wire despite being told that BNY could not confirm payment of the Check and knowing that its release of the wire would cause Freyberg to mistakenly believe that the bank had confirmed the Check was "good" and that the funds were properly collected. It disclosed neither the information received from BNY nor its prior determinations of a likely fraud.

---

[12] While Chase blames the loss on Freyberg's "haste in sending" the wire (ECF No. 65 at pp. 4-5), he never asked Chase to send the wire on March 14, but only sought information regarding the hold (Freyberg Aff. at ¶¶ 13, 14; MF Dep., Ex "A," at 188:7-189:11).

6

Chase cites to In re Sharp International Corp., 302 B.R. 760 (E.D.N.Y. 2003) for the proposition that a bank is not required to disclose a known fraud. Yet, in Sharp, the bank never assured its customer that it would only process a transaction after it obtained "proof" that no fraud was afoot, and also did not affirmatively mislead its customer, as Chase did here. Chase had an ethical, good faith duty to disclose to Freyberg that it had determined the transaction was likely fraudulent. As Chase was in the best position to avoid the loss, it must be equitably estopped from charging back Freyberg's account.

### Point IV
### Chase Fails to Substantively Address Freyberg's Counterclaims

Chase largely fails to address Freyberg's counterclaims, and he respectfully refers the Court to his prior Memorandum (ECF No. 58) and addresses the misstatements contained in Chase's opposition as follows:

a.  Negligent Misrepresentation

Chase challenges Freyberg's negligent misrepresentation claim on two meritless grounds. First, Chase asserts that Freyberg does not identify its misrepresentations or demonstrate that the same were false. Yet, Chase's multiple false misrepresentations are set forth at Point III.a, supra, and previously at, inter alia, ECF No. 58 at p. 15.

Chase also disregards as "facially preposterous" that a special relationship of trust and confidence was created as a result of Chase's undertaking to confirm that the Check was "good" before releasing the wire. Yet, in Greenberg, 17 N.Y.3d at 579 (2011), the Court of Appeals acknowledged that the bank-customer relationship does not preclude all customer claims for negligent misrepresentation: "To resolve this case, we do not need to decide whether the relationship between GTH [the customer] and HSBC [the bank] would preclude all possible claims for negligent misrepresentation..." The Second Circuit

7

has also recognized that a special relationship may exist where a customer places trust in the bank regarding a matter over which the bank assumes control and responsibility. Manufacturers Hanover Trust Co. v. Yanakas, 7 F.3d 310, 318 (2d Cir. 1993).

    b.    Fraudulent Misrepresentation

Chase mischaracterizes Freyberg's fraudulent misrepresentation claim as one for "fraudulent concealment" and asserts that it had no duty to disclose its determination of a suspected fraud. Yet, Freyberg's claim is not predicated solely on Chase's failure to disclose, but also upon its affirmative misrepresentations. Moreover, Chase had an ethical, good faith duty to disclose the information in its possession. See Point III, supra.

    c.    Expedited Funds Availability Act ("EFAA")

Unlike in Fischer & Mandell v. Citibank, N.A., 2009 WL 1767621 (S.D.N.Y. 2009) cited by Chase, Freyberg's EFAA claim is not predicated upon Chase's failure to delay available funds. Rather, Chase did in fact invoke the EFAA's "reasonable cause" exception when Freyberg deposited the Check, indicating that it had information that the Check "may not be paid." (ECF Nos. 57, 66 at ¶ 14). However, Chase refused to provide additional information regarding this matter, even after Freyberg inquired regarding the same, in violation of its duties under the EFAA. See 12 USC § 4003(c). Any additional information provided by Chase concerning its determination that the Check may not be paid would certainly have caused Freyberg to refrain from sending the wire.

    d.    UCC Bad Faith

Freyberg's UCC bad faith claim is predicated upon Chase undertaking to confirm the Check was "good," then releasing the wire after it failed to do so, all while concealing that it was releasing uncollected funds and had concluded the transaction was likely

8

fraudulent. Chase now seeks to place the consequences of its own reckless actions onto Freyberg, merely because he inquired about the basis for the hold. Yet, as per Chase's wire instructions, its gross negligence vitiates any obligation Freyberg may have had to indemnify Chase for a loss incurred as a result of the wire. (See Ex. "Q" at JPMC043).

As Chase has failed to rebut Freyberg's entitlement to summary judgment on his counterclaims, Freyberg's motion should be granted in its entirety.

## Point V
## Chase's Positions Regarding Discovery Are Disingenuous

Chase labels Freyberg's assertion that it intentionally destroyed recordings "outrageous," yet admits that the recordings are "unavailable pursuant to Chase's retention policy." No matter what euphemism Chase utilizes, it discarded relevant evidence after being informed that if it did not restore Freyberg's account balance, he would "be left with no choice but to commence appropriate legal action. . ." (See Exhibit "R" at JPMC 005). Chase failed to impose the litigation hold required by law, which requires the suspension of applicable document destruction policies. Richard Green (Fine Paintings) v. McClendon, 262 F.R.D. 284, 289 (S.D.N.Y. 2009).

Equally disingenuous are Chase's hearsay objections to Freyberg's use of the bank's investigation file and the notes of Chase employees Welch and Keener. Chase successfully blocked Freyberg from deposing Welch, Keener and Gavin Matranga (who investigated the matter for Chase),[13] in part on the grounds that it had produced their notes (August 10, 2015 Affidavit of Michael Giusto, Ex. "V", 28:25-29:16; ECF No. 29 at p. 18, fn. 8). Having successfully urged that the documents were suitable alternatives to

---

[13] See the February 3, 2015 Order of Magistrate Judge Netburn (ECF No. 21).

these depositions, Chase should be judicially estopped from objecting to the use of the documents. See Intellivision v. Microsoft Corp., 484 Fed.Appx. 616, 620-21 (2d. Cir. 2012) (Summary Order) citing New Hampshire v. Maine, 532 U.S. 742, 749 (2001) ("[J]udicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.").

## Point VI
## Parties May Modify Statutory Interest Rates

While Chase asserts that New York requires application of the statutory rate of pre-judgment interest, parties are free to modify such rate by contract under New York law. US Bank Nat. Ass'n v. Dexia Real Estate Capital Mkts., 2014 WL 4290642 at *2 (S.D.N.Y. 2014); Board of Mgrs. of 25th Charles St. Condo. v. Seligson, 126 A.D.3d 547, 549 (1st Dep't 2015). The case cited by Chase, Bruce Supply Corp. v. D&M Plumbing & Heating Corp., 291 A.D.2d 525, 526 (2d Dep't 2002) and the cases cited therein, hold only that a party cannot unilaterally modify the statutory rate by stating a different rate on its invoice. Any pre-judgment interest award herein must be governed by the provision of the Chase Account Agreement, which sets the rate of the same to 0.01%.

## CONCLUSION

Wherefore, Plaintiff's motion must be denied and Defendant's motion granted.

Dated: New York, New York
August 10, 2015

Respectfully submitted,

NEUFELD & O'LEARY

By: _____
David S.J. Neufeld (DN-0917)
Attorneys for Defendant
370 Lexington Avenue, Suite 908
New York, New York 10017
(212) 986-0999

10